UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SUSAN A. STRASSER,

                              Plaintiff,

          -against-                                      1:09-CV-00747 (LEK/RFT)

IRVING TISSUE, INC.,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

          On June 29, 2009, Plaintiff Susan Strasser ("Plaintiff" or "Strasser") filed this action

pursuant to Title VII of the Civil Rights Act of 1964, Complaint (Dkt. No. 1), having received a

right to sue letter from the United States Equal Employment Opportunity Commission ("EEOC")

dated March 30, 2009.  Dkt. No. 23-17 at 43.  Plaintiff also alleges violations of the New York

Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296(1)(a).  Compl. ¶ 50.  Defendant Irving

Tissue, Inc. ("Defendant" or "Irving Tissue") filed a Motion for summary judgment (Dkt. No. 23)

("Motion") on February 15, 2011, and Plaintiff responded with a Motion in opposition (Dkt. No. 31)

("Opposition") on March 29.  Defendant filed its Reply to Plaintiff's Opposition (Dkt. No. 35)

("Reply") on April 12.  For the following reasons, Defendant's Motion is denied in part and granted

in part.

## II. BACKGROUND

          Plaintiff alleges that she experienced both a hostile work environment and retaliation as an

employee of Defendant, a Delaware corporation that has its principal place of business and operates

a paper mill ("the Mill") in Fort Edward, New York.  Compl. ¶ 4; Def.'s Statement of Material

Facts (Dkt. No. 23-26) ("DSMF") ¶¶ 2-3.  With the exception of a brief period in which she was laid off during a downsize in 1994-95, Strasser was employed by Irving Tissue or one of its predecessors[1] for more than twenty years – from 1988 until May 2010 – although the last day that she actually worked in the Mill was December 20, 2007.  Id. ¶¶ 3, 168.  The bulk of the conduct at issue in this case commenced in October 2006 and, according to Plaintiff, occurred on a more or less continuous and frequent basis until that date.  Id. ¶ 80; Pl.'s Resp. to Def.'s Statement of Material Facts (Dkt. No. 30) ("PRSMF") ¶ 88.

### A. Public Address System Broadcasts

Strasser claims that, beginning in October 2006, she was the daily target of numerous inappropriate pages over the Company's Public Address ("PA") System in the Mill.  See, e.g., PRSMF ¶¶ 41, 88.  This PA system can be readily accessed by any of the employees in the Mill, and, although it is intended to be used only for emergencies or mundane work-related issues,[2] some of Irving Tissue's employees are prone to abusing the unfettered access they have to this system.  See DSMF ¶ 42.  A number of the company's employees have submitted affidavits stating that "it is not uncommon" for employees to use the PA system to "joke around, mimic, or play pranks on each other."  Id. ¶ 42 (citing Cerillo Aff. ¶¶ 16, 40; Bartwitz Aff. 5, 6, 21; Ashe Aff. ¶¶ 9, 10; Carpenter Aff. ¶¶ 12, 14; Dennis Aff. ¶ 7; Fish Aff. ¶ 3).  Although the parties dispute the precise nature and content of these "joking" pages, there is no dispute that an unknown number of anonymous employees made inappropriate broadcasts over the PA system while Plaintiff was working in the

---

[1] Irving Tissue acquired the paper mill in 1996 from Kimberly-Clark Corporation, which had acquired it in 1995 from Scott Paper Company.  DSMF ¶ 3 n. 1.

[2] These include summoning people to and requesting supplies for various machines in the Mill, and alerting employees to telephone calls or meetings.  PRSMF ¶ 41.

Mill.

Nor is there any dispute between the parties that at least some of these inappropriate broadcasts were targeted at Plaintiff.[3]  DSMF ¶ 79.  In 2004, Plaintiff was promoted to the position of Line Leader based on her seniority, and was the only female Line Leader on her shift.[4]  Id. ¶ 56; Plaintiff's Deposition Transcript (Dkt. Nos. 23-15 and 23-16) 16:18-22.  Her job entailed running a converting machine or "asset," which converts paper into rolls of bath tissue.  DSMF ¶ 57.  This in turn required her to know how to make adjustments to the machine, troubleshoot, and perform routine maintenance.  Id. ¶¶ 60, 63.  And, while the parties disagree both about the relative frequency with which she did this, and the extent of her requests, at times Plaintiff would use the PA system to page for assistance in the performance of her duties, for example, from a mechanic or a forklift driver.  See PRSMF ¶¶ 76-77; Plaintiff's Memorandum of law in opposition to Motion for summary judgment (Dkt. No. 31) ("POM") at 7.  In response, male voices speaking in high-pitched or "falsetto" voices would ring out over the PA system, with statements such as: "I need a man," "I'm desperate," "Somebody please help me," and "I don't know what to do."[5]  DSMF ¶ 83.  Such

---

[3] Defendant does cite to one instance in June 21, 2007, when Plaintiff's supervisor, William Daggett, heard a page mimicking Plaintiff's voice and "was upset because he believed this page was directed at him personally."  DSMF ¶ 127.  Defendant further claims that Plaintiff was unaware of this page until she heard about it from Mr. Daggett.  Id. ¶ 129.  Nonetheless, there seems to be no dispute that other similar pages occurred and that at least some of these were targeted at Plaintiff.  Id. ¶ 79.

[4] Currently Defendant employs three female Line Leaders; during the relevant time period, a female operator also worked on Plaintiff's shift full time.  DSMF ¶¶ 10-11.

[5] Plaintiff has also alleged that the pages were made in a "sexually suggestive and/or distressed" tone.  Pl.'s EEOC Charge of Discrim. (Dkt. No. 23-10) at 2; DMSF ¶ 183.  The Court is unclear whether by "sexually suggestive," Plaintiff either is referring solely to the fact that male employees were disguising their voices to mimic that of a female, or whether she is alleging that the pages had a "come-hither" tone indicating that she, for example, was "desperate" for male attention or "need[ed] a man" for sex.

pages would occur only after Plaintiff paged for assistance.  Id. ¶ 82.

In October 2006, the same month that these pages began, Andy Dobroski, then-vice president of the union to which Irving Tissue's employees belong,[6] contacted Sarah Cerillo, the Human Resources Manager, to report that an employee had mimicked Strasser over the PA system. DSMF ¶ 85.  Defendant claims that Ms. Cerillo followed up on Mr. Dobroski's report and asked Douglas Westwell, a manager, to investigate, and that Mr. Westwell met with both Plaintiff and her supervisor, William Daggett.  Id. ¶¶ 87-88.  Plaintiff claims that she recalls reporting the pages to Mr. Daggett repeatedly, but does not recall ever meeting with Mr. Westwell or discussing the conduct at issue with him.  PRSMF ¶¶ 88, 99.

Mr. Westwell has also submitted in a sworn affidavit that he contacted the IT department to determine where the pages were coming from, but the IT department could only track when and from what general area of the Mill pages were made.  Westwell Aff. ¶¶ 9-11.  Mr. Westwell has further stated that he was unable to find the exact individuals responsible, but that he warned members on Strasser's crew that inappropriate use of the PA system would not be tolerated and that any employee caught making such inappropriate use of it would be subject to discipline and possibly termination.  DSMF ¶ 96.  He also states that in the course of this investigation he learned from talking to other employees that they resented Plaintiff because they perceived her as inept at her job.  Id. ¶¶ 97-98.  Both Mr. Westwell and Ms. Cerillo have stated that subsequently they each followed up separately with Strasser regarding the pages, and that she indicated to them that everything was fine.  Id. ¶¶ 100, 102.  Plaintiff, however, denies that these conversations took place.

---

[6] Defendant operates pursuant to a collective bargaining agreement with the United Steelworkers, Local 4-2.  DSMF ¶ 6.  All bargaining unit members, including Plaintiff, have the right to bring a grievance relating to a workplace complaint.  Id.

PRSMF ¶¶ 100, 102.

The pages targeted at Strasser allegedly persisted through the rest of 2006 and all of 2007, until her departure that December.  POM at 7.  Defendant claims that on a later occasion, following a mimicking page in June 2007 that Mr. Daggett apparently reported because he believed it was targeted at him, Mr. Dobroski and Ron Bartwitz, the Converting Manager, again advised employees that inappropriate use of the PA system would result in discipline, up to and including termination. DSMF ¶¶ 127-130.  According to Defendant, Mr. Dobroski and Mr. Bartwitz reissued Irving Tissue's anti-discrimination/anti-harassment policy to each employee.  Id. ¶ 130.  Mr. Bartwitz and David Dennis, the Plant Manager, also claim that they both met with Strasser and that she did not report any more harassing pages to them.  Id. ¶¶ 131-32.

Plaintiff flatly denies having had this conversation with Mr. Dennis.  PRSMF ¶ 131.  She does recall one occasion on which Mr. Bartwitz told her that they were going to "hand out the harassment papers to see if it would stop."  Id. ¶ 132.  Plaintiff also states that while she did not report the paging to Mr. Dennis or Mr. Bartwitz, she did complain repeatedly to Mr. Daggett as her direct supervisor, and occasionally to Ms. Cerillo, although she "assume[d]" that Mr. Daggett was reporting her complaints to the latter.  Pl.'s Dep. Tr. 130:18-20.  Plaintiff states that in reporting primarily to Mr. Daggett, she was acting as she perceived she was required to do in order to comply with Defendant's internal complaint handling process.  See PRSMF ¶ 133; Dkt. No. 23-17 at 20. She has also testified that one day when employees were mocking her over the PA system, Ms. Cerillo was telephoned at home and responded to the report by advising Plaintiff to "hold her head high and walk back out there."[7]  Pl.'s Dep. Tr. 144:3-6.  Moreover, her husband Michael Strasser,

---

[7] Plaintiff also testified that Ms. Cerillo spoke separately with Mr. Dobroski and Mr. Daggett after Plaintiff left the room that day.  Pl.'s Dep. Tr. 144:19-20.

also an employee of Defendant, recalls repeatedly voicing his concerns about his wife's treatment to Mr. Daggett,[8] Mr. Dobroski, and Ron Pliscovsky (then-president of the union).  See Michael Strasser Deposition Transcript (Dkt. No. 23-19) 68:4-75:6.

### B. Other PA Broadcasts and the "Break Roll" Incident

Beyond the inappropriate PA broadcasts, Plaintiff raises several other allegations of harassment that she experienced in the Mill.  In general, she alleges that her crew members frequently harassed her by playing various pranks on her, such as distracting her from her work by paging her that she was needed in another area of the Mill when in fact she was not.  See POM at 7-8.

Another particularly disputed incident occurred in March 2007, when Strasser reported to Mr. Daggett that she wanted to be assigned to another crew[9] because she felt harassed by some of her male crew members.  DSMF ¶ 104.  Specifically, she claimed that Matt Sargent, the Parent Roll Supplier, had brought her a roll of paper with six "breaks" in it.  Id.  A roll with "breaks" separates in the machine, requiring the Line Leader to "rethread" it in order to continue production.  Id.  ¶¶ 105-06.  According to Plaintiff, this was an unusually high number of breaks in a roll, and having to rethread the machine so many times as a result put her in danger as it "needlessly expos[ed]" her to "the blades and saws" of the machine.  PRSMF ¶ 106.  She also observed her crew members huddled together laughing at her after the roll was delivered to her machine.  DSMF ¶¶ 107-08.

---

[8] Mr. Daggett is no longer employed by Defendant, see Pl.'s Dep. Tr. 43:4, and, the Court infers, has not been located by either party in order to corroborate or contradict Plaintiff's and her husband's testimonies about their conversations with him.  Mr. Westwell has stated in his Affidavit that Mr. Daggett was fired "for a variety of performance issues . . . including handling of the workplace issues raised by Ms. Strasser."  Westwell Aff. ¶ 19.

[9] Beginning in 2000, Defendant grouped its employees into four crews, each of which worked 12-hour shifts.  DSMF ¶ 23.

Defendant claims that, at Ms. Cerillo's request, Mr. Daggett and Mr. Dobroski investigated the incident and concluded that "it was simply a misunderstanding."  Id. ¶ 111.  Ms. Cerillo states that Mr. Daggett reported this conclusion to Strasser and the other individuals involved; Strasser denies that this occurred.  PRSMF ¶ 112.

### C. Alleged Sexual Comments Directed at Plaintiff by Men in the Mill

Strasser further alleges two instances in which she was the target of sexually demeaning comments.  First, she alleges that in October 2007, Paul Carpenter, another Irving Tissue employee, made a sexually charged comment in response to a page Plaintiff had made requesting an electrician.  Compl. ¶ 20.  According to Strasser, when Mr. Daggett responded to her page and asked her why she had paged for an electrician, Mr. Carpenter interjected that Strasser was "having an affair with [the electrician] and want[ed] to know when they could meet."[10]  Id.; see also POM at 9.  Strasser claims that she reported this to her supervisor; Defendant claims that it had no knowledge of the incident until Plaintiff mentioned it to Ms. Cerillo during a telephone conversation in June 2008.  See PRSMF ¶ 180.

Second, Plaintiff alleges that in 2002, John Seaborn, the Director of North American Operations for Defendant, stated to her when she was working on a paper log that was five feet eight inches long: "Just the way you like 'em–long and hard."  Compl. ¶ 24.  Mr. Seaborn, for his part, denies ever having made that statement to Plaintiff.  Seaborn Aff. (Dkt. No. 23-23) ¶ 5.  Plaintiff also claims that she reported Mr. Seaborn's remark to Mr. Pliscovsky as president of the union and that he responded by laughing.  Pl.'s Dep. Tr. 125:4-19.

---

[10] Plaintiff also alleges that Carpenter on another occasion referred to her and another female Line Leader as "idiots" when typing an entry into a machine's computer log; however, Mr. Daggett was also present when this occurred and, when Carpenter refused to remove the statement from the log, Mr. Daggett removed it himself.  POM at 9.

**D. Michael Strasser's Shift Change and Plaintiff's Termination**

Plaintiff initially claimed that Defendant retaliated against her "by constructively terminating her solely because she reported sexual harassment." Compl. ¶ 42. Now, Plaintiff seems to rest her retaliation argument more specifically on the fact that Defendant reassigned her husband to a different crew, meaning that the two would no longer be able to work the same hours.[11] POM at 11. When this change occurred, Plaintiff complained to Ms. Cerillo that she believed Defendant was changing her husband's shift to punish her for her previous complaints. DSMF ¶¶ 136, 140. Ms. Cerillo told Plaintiff that this was not Defendant's intent and that her husband was being moved to a different shift because the machine he had been working on, the Continuous Winder ("CW"), had to be shut down because of its decline in profitability. Id. ¶¶ 136, 140-42. Ms. Cerillo repeated this explanation in a meeting with both Mr. Strasser and Plaintiff on December 14, 2007. Id. ¶¶ 154-55. Mr. Strasser indicated that he understood that the change was for business reasons and not personal ones, and reiterated this understanding in his deposition. Id. ¶ 155; M. Strasser Dep. Tr. 29:6-8. When asked by Defendant's counsel during her deposition whether she thought Defendant had retaliated against her, Plaintiff responded, "I don't know." Pl.'s Dep. Tr. 163:2-4. When pressed repeatedly as to why she might think Defendant had retaliated against her, Plaintiff responded, "They didn't stop the harassment or anything. I had to leave," and that "[t]hey didn't do anything about it." Id. 164:8-12; 166:5-6.

Plaintiff left the Mill on December 20, 2007, due to either holidays, illness, or vacation, but

---

[11] As discussed below, it is unclear to the Court exactly what Plaintiff is referring to when alleging that Defendant "retaliated" against her "by constructively terminating her"–i.e., whether the alleged retaliation consisted solely of moving Mr. Strasser to a different shift, as their Opposition seems to indicate, or whether it consists of a more general pattern of harassment that would constitute constructive termination. See POM at 11, 13, 16.

reported to Ms. Cerillo on January 16, 2008, that she was going to be out of work due to "work-related stress." DSMF ¶¶ 169-70.  Shortly afterwards, Plaintiff filed a Workers' Compensation claim with the New York Workers' Compensation Board ("WCB") on the basis of workplace harassment.  Id. ¶ 172.  She also filed sex discrimination complaints with the New York State Division of Human Rights and the EEOC on March 31, 2008.  Id. ¶ 182.  The WCB denied her claim on August 21, 2008; the decision was affirmed on November 10, 2008, and once again after a reconsideration on December 10, 2008.  Id. ¶¶ 173-75.  Plaintiff's request for review of the decision was denied on October 19, 2009.  Id. ¶ 176.  Plaintiff's discrimination complaint with the EEOC was also dismissed on March 30, 2009, and she was given a right to sue letter.  Id. ¶ 186.

During this time, Plaintiff continued to provide Defendant with doctors' notes, prompting Defendant to extend her medical leave.  DSMF ¶ 189.  On June 3, 2008, Human Resources contacted Plaintiff to tell her that another Line Leader position had opened up on her husband's crew and offered her the opportunity to work in that position.  Id. ¶ 179.  Plaintiff declined and claims that she did so as a result of the harassment she experienced at her job.  PRMSF ¶ 179-81.  However, Defendant's leave of absence policy provides for termination of employment if, after 27 months, it cannot be determined when an employee can be reasonably expected to return to work and the employee will likely continue to be absent indefinitely.  DSMF ¶ 188.  Defendant contacted Plaintiff on February 16, 2010, informing her that her medical leave was due to expire on April 13; Plaintiff's last doctor's note, dated April 20, 2010, stated that she could return to work on May 18, 2010, with no restrictions.  Id. ¶ 193.  When Plaintiff did not return to work on May 19, after 28 months of leave, Defendant terminated her employment.  Id. ¶¶ 194, 197.

**III. STANDARD OF REVIEW**

Rule 56 of the Federal Rules instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

However, if the moving party has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).  The Court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Additionally, the Second Circuit has directed district courts to "be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination."  Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999);

see also Gallo, 22 F.3d at 1224 ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.").  Such caution is especially necessary in sexual harassment cases, "where questions of state of mind are enmeshed in complicated fact scenarios rife with disagreement." Carrasco v. Lenox Hill Hosp., No. 99 Civ. 927, 2000 WL 520640, at *5 (S.D.N.Y. Apr. 28, 2000) (citing Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998), abrogated on other grounds, Burlington Indus., Inc., v. Ellerth, 524 U.S. 742 (1998); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998) ("[S]ummary judgment should be used sparingly when, as is often the case in sexual harassment claims, state of mind or intent are at issue.") (internal quotations omitted); DiLorenzo v. Atlantic Paratrans, Inc., 926 F. Supp. 310, 314 (E.D.N.Y. 1996) (describing a hostile work environment claim as presenting "the sort of issue that is often not susceptible of summary resolution")); see also Gallagher, 139 F.3d at 343 (noting that "[t]he dangers of robust use of summary judgment to clear trial dockets are particularly acute in sex discrimination cases").

Finally, the standard of liability for hostile work environment claims under New York state law is the same as the standard for those brought under federal law.  Demoret v. Zegarelli, 451 F.3d 140, 152 (2d Cir. 2006); Allen v. Advanced Digital Info. Corp., 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007) ("[C]laims under the NYHRL and under Title VII are essentially identical."); Forrest v. Jewish Guild for the Blind, 765 N.Y.S. 2d 326, 332-33 (N.Y. App. Div. 2003) ("[T]he standard for recovery under section 296 of the Executive Law is in accord with the federal standards under [Title VII].").  Thus, in determining whether summary judgment is appropriate, the Court will apply the same standard to both Plaintiff's Title VII and NYHRL claims.

**IV. DISCUSSION**

In seeking summary judgment, Irving Tissue presents three main arguments: first, that

Plaintiff has failed to establish a hostile work environment under Title VII, because the alleged

conduct at issue was neither "gender-based," nor sufficiently severe or pervasive so as to create a

hostile work environment; second, that Plaintiff's allegations cannot be imputed to it as the

employer; and finally, that Plaintiff cannot prove that Defendant retaliated against her, whether by

constructively discharging her or otherwise.  Defendant's Memorandum of law supporting summary

judgment (Dkt. No. 23-25) ("DML") at 22.  The Court finds that summary judgment must be

granted only with respect to the third and final argument.  Upon reviewing all the evidence before it,

the Court cannot conclude that a reasonable factfinder could not find that the alleged harassment

was both gender-based and sufficiently hostile to alter the conditions of Plaintiff's employment.

Moreover, the Court finds that genuine issues of material fact exist as to whether the conduct of

Irving Tissue's employees can be attributed to the Defendant.  Therefore, Plaintiff's hostile work

environment claim may proceed, but summary judgment is granted with respect to her claim of

retaliation.

**A. Hostile Work Environment Claim**

In order to establish a hostile work environment under Title VII, Plaintiff must show that she

experienced harassment that was: (1) based on her gender, Oncale v. Sundower Offshore Serv's,

Inc., 523 U.S. 75, 81 (1998); and (2) sufficiently severe or pervasive as to alter the conditions of her

employment by creating a work environment that would reasonably be perceived as hostile and

abusive.  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (internal quotations omitted).  Moreover,

Plaintiff must demonstrate a specific basis for imputing to her employer the conduct that created the

hostile environment.  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).

       1. Gender-Based Harassment

Defendant claims that Plaintiff cannot show that the alleged harassment was based on her gender.  First addressing what is perhaps the most offensive sex-related comment alleged by Plaintiff – the comment by Seaborn that a paper log was "just the way [she] liked them – long and hard" – Defendant argues that it is time-barred because EEOC complaints charging Title VII violations must be filed within 300 days from when the cause of action accrued, 42 U.S.C. §§ 2000e-5(e)(1), unless the untimely allegations are part of a "continuing violation" that would extend the limitations period.  Quinn v. Credit Tree Corp., 159 F.3d 759, 765 (2d Cir. 1998).  The Court agrees with Defendant.  The Court cannot find that this alleged remark, made four years before the conduct at the crux of Plaintiff's Complaint commenced, is "reasonably related" to the rest of the conduct that she alleges.  See id., 159 F.3d at 766 (finding untimely acts "sufficiently isolated in time . . . as to break the asserted continuum of discrimination").  However, a jury may still consider the incident as relevant background evidence of a hostile work environment, even if it is time-barred.  See Ramirez v. New York Presbyterian Hosp., 129 F. Supp. 2d 676, 680 (S.D.N.Y. 2001) (quoting United Air Lines v. Evans, 431 U.S. 553, 558 (1977)).

To the extent that Plaintiff was otherwise allegedly harassed by her coworkers in 2006 and 2007, the Court considers that the identities of the pagers are unclear, but of more significance to this case – and a more hotly contested subject between the parties – is the nature of their motivations in making these broadcasts.  At the heart of Plaintiff's hostile work environment claim is the allegation that the pagers acted out of bias against her based on her gender and, specifically, her status as the only female Line Leader on her shift.  See POM at 14-16; Pl.'s Dep. Tr. 16:18-22.

Defendant, however, has presented a different narrative, in which Plaintiff's harassment was based entirely on her own ineptitude at her job rather than her sex.

Defendant has incorporated into its Material Facts and its Memorandum of Law – and has provided affidavits from some of its employees containing – statements indicating that employees at the Mill resented Strasser because she held a high-paying position as Line Leader but was "unwilling[] or [unable] to actually perform the duties required of a Line Leader."  DML at 8-9; see also DSMF ¶¶ 69-71.  Defendant argues that the real reason Plaintiff began experiencing harassment in 2006 – when she had been promoted to Line Leader in 2004 – was that Michael Strasser had been helping her with her job until he was transferred to a different building in September 2006.[12]  See DSMF ¶¶ 72-76.  Plaintiff insists that she "was a fully competent and knowledgeable Line Leader," PRSMF ¶¶ 69-78, and Plaintiff's counsel has supplied statements – all unsworn[13] – from other

---

[12] The Court notes that Michael Strasser was not married to Plaintiff until January 2007. Pl.'s Dep. Tr. at 7:11-16; see also PRSMF ¶ 72.

[13] Defendant has moved in limine to exclude an unsigned affidavit submitted by Plaintiff from Peggy Woodcock, a temporary employee who has worked at the Mill since 2006.  Defendant's Reply memorandum of law in support of Defendant's Motion for summary judgment (Dkt. No. 35-5) ("Reply") at 21-22; Dkt. No. 32-8.  The unsigned affidavit states, inter alia, that the harassing pages against Strasser "occur[red] almost constantly" and that "[i]n my opinion, mean spirited and insulting pages by male workers directed at Strasser was sexual harassment."  Id. at 1-2.  Plaintiff's counsel has submitted a sworn affidavit from his assistant, a notary, who states that she met with Ms. Woodcock, and that Ms. Woodcock intended to sign the affidavit that day but did not have any photo identification, and thus the assistant could not notarize it for her.  See Lacijan Aff. (Dkt. No. 32-7) at 2.  This affidavit further states that Ms. Woodcock said she would return to sign it, but never did.  Id.  Ms. Woodcock has now submitted an affidavit for Defendant declaring that she did not feel comfortable signing the previous affidavit and acknowledging that she did receive a telephone call from Ms. Cerillo between agreeing to sign the first affidavit and actually signing the second, but that the call was unrelated to this litigation.  Compare Dkt. No. 32-7 at 2; with Dkt. No. 35-2.  At present the Court notes only that it may consider the unsworn Woodcock affidavit on summary judgment, see Celotex, 477 U.S. 317 at 324, and will reserve the issue of its admissibility for when the Court addresses Defendant's Motion in limine on the eve of trial.

employees stating, *inter alia*, that Plaintiff "is a very good operator," and that "I'd take her on my shift any day of the week."  Pl.'s Ex. 1 (Dkt. No. 32-1).  Apparently Irving Tissue does not have any objective evaluation procedures in place; Plaintiff's counsel submits only one (positive) evaluation of her performance in 1988, at the beginning of her career at the Mill and before she was promoted to Line Leader.  See Dkt. No. 32-4.  While this is largely irrelevant to Plaintiff's competence as a Line Leader nearly twenty years later, the Court notes that despite Defendant's characterization of Plaintiff as an inept Line Leader – a plausible characterization that may well be true – there is no record of Strasser's direct supervisor or any other Irving Tissue managers having criticized, reprimanded, or otherwise counseled Plaintiff in any way on her supposed inabilities to perform at her job during the three years she worked in that capacity.

Defendant claims that her co-workers' perceptions of her as incompetent "are well supported by Plaintiff's constant paging for assistance with her Line Leader duties," Def.'s Reply at 14, yet Plaintiff has testified that she did not page any more frequently than the other (exclusively male) Line Leaders on her shift did.  See Pl.'s Dep. Tr. at 141:13-24.  The Court understands that Plaintiff's perceptions of the relative frequency of her pages may be incorrect, just as it understands that it may be difficult for Plaintiff to find former colleagues still employed by Defendant and willing to testify to her competence at her job in this case.  Nonetheless, the Court finds that a genuine factual dispute exists as to whether Plaintiff was a poor performer and for that reason, not her sex, was singled out for harassment by her coworkers.

Of course, even if Plaintiff was capable at her job, that does not automatically give rise to an inference that the alleged harassment was gender-based.  See Mulkey v. Hofstra Univ., No. 98-9304, 1999 WL 425898, at *2 (2d Cir. June 10, 1999) ("Men are not presumed to have a discriminatory

animus against women.").  Although Plaintiff does cite one comment by Paul Carpenter during the relevant time period that could be construed as sex-based – i.e., the comment to Daggett that she was having an affair with the electrician – that isolated incident alone does not demonstrate that Plaintiff experienced a hostile work environment based on her sex.  See Whidbee. v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) ("[A] mild, isolated incident does not make a work environment hostile.").  Plaintiff also cites Defendant's argument that Michael Strasser provided her with assistance until September 2006 as proof of its employees' "clear" gender bias, namely, that they believed she needed male assistance to be effective at her job.  POM at 16-17.  While this is hardly the indisputable proof of bias that Plaintiff makes it out to be, the Court does consider that her lesser-paid male coworkers may have resented Strasser's more lucrative position of authority over them as a woman, and singled her out for continuous harassment that male Line Leaders who also sought assistance did not receive.  See DSMF ¶ 135 (noting Plaintiff's acknowledgment that her coworkers were "envious of her job").

Although Defendant has submitted a number of affidavits from employees stating that men are also the subject of mockery over the PA system and that practical jokes are also played on male employees, see id. ¶ 46, Plaintiff alleges that the conduct directed at her was more continuous and more severe than it was towards other male employees.  PRSMF ¶ 46.  The Court considers that such a factual dispute is inappropriate for summary judgment, and that a jury is better suited to weigh the relative credibility of Plaintiff against that of Defendant's employees and determine whether the conduct to which she was subjected was in fact motivated by gender animus, or by mere "[s]pite and personal hostility . . . between persons of the opposite sex."  LaMarco v. New York State Nurses Assoc., 118 F. Supp. 2d 310, 318 (N.D.N.Y. 2000); see also Gallagher, 139 F.3d at

343 ("In this period of rapidly changing and conflicting views of appropriate gender relationships in the workplace, decisions by a jury in debatable cases are sound in policy and consonant with the Seventh Amendment.").

Moreover, a reasonable factfinder could view the PA pages as supporting a gender-based animus, given that the employees assumed a falsetto/female voice and consisted of comments such as "I need a man" and "I'm desperate." DSMF ¶ 83. If Strasser in fact was no less competent at her job than were her male counterparts, the delivery and the content of the pages could support a reasonable inference that they were based on assumptions of Strasser's weakness and inferiority because of her sex. The Court does not accept Plaintiff's argument that her coworkers' belief that she needed her husband's assistance is *prima facie* evidence of their gender bias, nor is the fact that Plaintiff worked in a male-dominated environment *prima facie* evidence of sex discrimination. See Mulkey, 1999 WL 425898, at *2. However, the Second Circuit has noted that in such an environment, female leaders "may be particularly vulnerable to such diminution of authority . . . because of stereotypical assumptions about the propriety of women exercising authority in traditionally male-dominated occupations." Dawson v. Cty. of Westchester, 373 F.3d 265, 273 (2d Cir. 2004); see also Pascal v. Storage Tech. Corp., 152 F. Supp. 2d 191, 208-09 (D. Conn. 2001) ("[V]iewing all inferences in plaintiff's favor, a reasonable juror could find that in the context of a predominantly male work environment, the comments about women and the specific incidents targeting plaintiff were harassment because of plaintiff's sex.").

Defendant points out in its Reply that many more sexually offensive epithets exist in this world than the comments allegedly hurled at Plaintiff over its PA system. Def.'s Reply at 18-19. However, an action for sexual harassment can be based on sex without having anything to do with

sexuality or sexual desire.  See Oncale, 523 U.S. at 80 ("[H]arassing conduct need not be motivated

by sexual desire to support an inference of discrimination on the basis of sex."); Raniola v. Bratton,

243 F.3d 610, 617 (2d Cir. 2001).  In considering whether harassment is gender-based, the Court

considers the "crucial question" to be not "simply whether the remarks to which [Plaintiff was]

subjected were of an explicitly sexual nature."  Dawson, 373 F.3d at 274.  Rather, the question is

whether the workplace atmosphere on the whole undermined Strasser's ability to perform her job

and compromised her status as an equal to her male colleagues in the Mill.  Id. (citing Gregory v.

Daly, 243 F.3d 687, 700 (2d Cir. 2001) (quoting Equal Emp't Opportunity Comm'n v. Farmer Bros.

Co., 31 F.3d 891, 898 (9th Cir. 1994) (noting that "the 'sexual' element of the harassment is only

secondary" in situations in which sexual harassment is used "primarily to subordinate women, to

remind them of their lower status in the workplace, and to demean them."))).  The Court finds that a

jury will be in a better position than this Court to resolve this question by weighing the credibility of

Defendant's employees and that of the Plaintiff in describing their work environment at the Mill,

and in turn assessing whether that work environment was hostile to Plaintiff because of her gender.

2. Severe or Pervasive Conduct

Defendant contends that even if the harassment Plaintiff alleges was gender-based, it did not

give rise to a hostile work environment because it was neither sufficiently severe nor pervasive to

create a work environment that altered the conditions of Plaintiff's employment.  See DML at 11.

The Court has reviewed the various affidavits and deposition transcripts submitted by the parties in

this case, and concludes that a reasonable factfinder could find that the conduct to which she was

subjected at the Mill was sufficiently severe or pervasive as to alter the conditions of her

employment there.

"Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is neither easy nor, in many cases, appropriate." Ponticelli v. Zurich Am. Ins. Grp., 16 F. Supp. 2d 414, 429 (S.D.N.Y. 1998). To satisfy the requirement of severity or pervasiveness in the context of a hostile work environment claim, the alleged conduct must be evaluated from both a subjective and objective standard: The victim must "subjectively perceive the environment to be abusive," Harris, 510 U.S. at 21, and it must be objectively abusive, namely, "a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999), abrogated on other grounds, Burlington, 524 U.S. 742.

The Court finds that genuine factual disputes remain both as to whether Plaintiff perceived her work environment at the Mill as hostile, and whether it was objectively so. Plaintiff has testified that her coworkers' treatment of her made her a "nervous wreck" and that she "didn't want to operate the machine anymore because [she] was so nervous." Pl.'s Dep. Tr. 142: 21-22. She also has testified, inter alia, that she was having nightmares and throwing up every day before work as a result of the harassment. See id. 143:2-4. Throughout her leave of absence, which she informed Defendant she was taking due to "work-related stress," DSMF ¶ 171, she visited a number of doctors, including psychiatrists, who advised her and apparently submitted notes to Defendant verifying that she could not work. See Pl.'s Dep. Tr. 64:18 - 68:9; DSMF ¶¶ 195-96. Michael Strasser has also testified that on numerous occasions Mr. Daggett approached him at work, told him that his wife had left her machine at the Mill to go outside because the broadcasts over the PA were distressing her, and advised Mr. Strasser to "go back and talk to her." M. Strasser Dep. Tr. 74:17 - 75:6. Several of Defendant's employees claim that they made follow-up inquiries to

Plaintiff after she reported harassment and that she told them everything was fine; Plaintiff denies that any of these conversations took place. See PRSMF ¶¶ 112, 131-32, 180. Drawing all reasonable inferences in Plaintiff's favor, see Reeves, 530 U.S. at 150, the Court finds a triable issue of fact as to whether Plaintiff subjectively perceived that the alleged conduct was abusive and made her work environment a hostile one.

The Court further finds that the issue of whether the alleged conduct was objectively hostile is more appropriate for resolution by a jury than for summary judgment. The Supreme Court has directed courts to "look[] to all the circumstances" in deciding whether a work environment is objectively hostile, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Taking these factors into account and drawing all inferences in Strasser's favor, the Court finds that summary judgment is inappropriate on the question of whether her work environment was an objectively hostile one.

Looking to the frequency of the discriminatory conduct, the Court considers that, notwithstanding Seaborn's alleged comment in 2002, the pattern of conduct alleged by Plaintiff persisted for over a year and occurred on an almost daily basis. See POM at 6-7. The Court agrees with Defendant that Carpenter's and Seaborn's isolated remarks, however inappropriate, cannot in and of themselves sustain a hostile work environment claim. "[S]imple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment." Sedotto v. Borg-Warner Prot. Servs. Corp., 94 F. Supp. 2d 251, 264 (D. Conn. 2000) (citing Oncale, 523 U.S. at 80). However, viewed in tandem with Plaintiff's other allegations of harassment, a reasonable factfinder might consider them, while

insufficient to establish a hostile work environment, relevant to the extent that they reflect an environment in which it is acceptable for an employee to demean a female supervisor by making insinuating or sarcastic references to her sex life.  A reasonable factfinder could further conclude that the alleged frequency with which the bulk of the alleged conduct occurred rendered it sufficiently severe or pervasive to have altered the conditions of Strasser's employment at the Mill.

As to the issue of whether the alleged conduct unreasonably interfered with Plaintiff's work performance, the Court considers both Plaintiff's and her husband's testimony and the fact that numerous doctors, including psychiatrists, deemed her unable to return to work, as giving rise to a plausible inference that the conduct did in fact interfere with her job performance.  Moreover, in both her deposition and Opposition, Plaintiff has painted the Mill as a considerably high-risk work environment, in which harassment of the kind she describes might plausibly have altered the conditions of her employment to a greater degree than it would have in other forms of employment. See POM at 5-8.  Plaintiff testified that, as a result of the alleged harassment, "I couldn't concentrate on my machine.  You've got a saw . . . You can get wrapped up in the machines.  You can drop a roll off a hoist . . . [Y]ou don't want to be harassed your whole shift."  Pl.'s Dep. Tr. 140:23 - 141:4.  Considering these factors and again drawing all reasonable inferences in Strasser's favor, the Court finds that a reasonable factfinder could conclude that the harassment she alleges was sufficiently severe or pervasive so as to worsen these conditions to the point that it hindered to ability to perform her job.  See Dawson, 373 F.3d at 273 (emphasizing "potentially dangerous" nature of the workplace environment in the prison context and noting that the potential for harassment to "undermine [plaintiff's] sense of personal safety or compromise her capacity to command respect and obtain compliance from co-workers [and] subordinates . . . assume[s] greater,

-21-

not lesser, significance.").

Finally, Defendant argues that the conduct at issue amounts to no more than "mere offensive utterance[s]" that do "not rise to the level of a hostile work environment."  Def.'s Reply at 18. Resolving this ambiguity in the Plaintiff's favor, the Court considers that targeting a coworker with a "constant barrage" of derisive PA pages day after day for over a year, in addition to the remainder of the conduct alleged by Plaintiff, could be deemed sufficiently humiliating to constitute an abusive work environment.  See Lee v. Glessing, 140 F. Supp. 2d 215, 223 (N.D.N.Y. 2001) ("While the harassment suffered by plaintiff may seem somewhat insubstantial, the court cannot say, as a matter of law, that no reasonable jury would find that a hostile work environment existed.").

Defendant argues that the type of conduct at issue here is less egregious than the conduct in other cases where district courts have granted the employer summary judgment.  See DML at 13 (citing Ford v. New York City Dep't of Health & Mental Hygiene, 545 F. Supp. 2d 377 (S.D.N.Y. 2008) (granting summary judgment for employer where plaintiff had been called a "fat fish," "stupid fish," "dyke," and "faggot" several times a day by coworkers)).  Yet the Court considers that unlike in Ford, a genuine issue exists as to whether Plaintiff's job performance was hampered by these comments.  See Ford, 545 F. Supp. 2d at 393.  Furthermore, "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases."  Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997); see also Lee, 140 F. Supp. 2d at 222 (behavior that is purely verbal and not accompanied by physically threatening behavior may still constitute actionable sexual harassment).

On a final note, the Court considers that "[a] federal judge is not in the best position to define the current sexual tenor of American cultures in their many manifestations."  Gallagher, 139

F.3d at 342. Rather, because "gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting," it is the Court's view that "a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation." Id.

### 3. Vicarious Liability

Defendant further argues that Plaintiff cannot sustain her hostile work environment claim because she has not established a basis for imputing liability to Irving Tissue for the actions of its employees. DML at 16-22. Reviewing the record before it and resolving all ambiguities in Plaintiff's favor, the Court finds that genuine issues of fact exist such that summary judgment on this issue is unwarranted at this time.

Where the alleged harasser is a coworker rather than a supervisor, as is the case here,[14] the "employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." Quinn, 159 F.3d at 766. At the summary judgment stage, however, "[i]f the employer is found to have been on notice of the sexual harassment, summary judgment is inappropriate where there is evidence that presents an issue of fact as to whether the employer's action was 'effectively remedial and prompt.'" Dawson v. County of Westchester, 351 F. Supp. 2d 176, 192 (S.D.N.Y. 2004) (quoting Gallagher, 139 F.3d at 348); see also Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1181 (2d Cir. 1996) ("The question of whether an employer has provided a 'reasonable avenue of complaint' is a question for the jury.").

---

[14] As the Court has already found that Plaintiff's claim regarding the alleged comment made by Mr. Seaborn is time-barred, *supra*, it need not address the issue of Defendant's liability for that alleged incident.

Here the Court finds that a genuine factual dispute exists as to the sufficiency of Irving Tissue's actions to remedy the alleged harassment.  It is true that "[a]n employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct."  Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999).  Nonetheless, reviewing the record before it and drawing all reasonable inferences in Plaintiff's favor, the Court finds that a reasonable jury could conclude that Irving Tissue failed to take reasonable steps to eliminate the alleged conduct.  See Ponticelli v. Zurich Am. Ins. Grp., 16 F. Supp. 2d 414, 431 (S.D.N.Y. 1998) (finding factual dispute, and therefore summary judgment inappropriate, where plaintiff claimed that her sexual harassment complaints "were not adequately investigated and promptly corrected").

Here, the extent of Irving Tissue's response to reports of Strasser's conduct is a matter of significant factual dispute between the parties.  Strasser claims that she reported all incidents to her supervisor, Mr. Daggett, in full compliance with the company's anti-discrimination/anti-harassment policy.  See PRSMF ¶¶ 86-103.  It appears that Mr. Daggett investigated the pages at some point in October 2006 and, when he failed to discover the culprit(s), warned Plaintiff's coworkers that they would be subject to discipline if they made any more inappropriate pages.  Pl.'s Dep. Tr. 79-80.  Nonetheless this alleged conduct persisted for over a year after this investigation, despite, *inter alia*, Plaintiff's insistence that she continued to report inappropriate pages to Mr. Daggett in compliance with the company's policy, see id. 120:13, 128:19-22, 130:20, and Michael Strasser's testimony that he complained to both the president and vice president of the union on his wife's behalf and talked to Mr. Daggett "probably at least a dozen times about his need to do something."  M. Strasser Dep. Tr. 68:7 - 74:16.

Defendant argues that liability cannot be imputed to it because Plaintiff continued to complain to Mr. Daggett instead of seeking out other avenues of complaint, such as Ms. Cerillo (who apparently did receive at least one call about the problem and responded by advising Plaintiff to "hold [her] head high and walk back out there").  In Defendant's view, it makes no sense that Plaintiff would fail to avail herself of other avenues of complaint if she believed Mr. Daggett was ineffective at addressing her issues.  DML at 21.  While a reasonable factfinder might well agree with this argument, the Court does not find it appropriate to penalize Plaintiff at the summary judgment stage for doing what she perceived, and what, in fact, Defendant's complaint handling procedure called for, i.e., reporting the alleged harassment to a direct supervisor.  See id. ¶ 133; Dkt. No. 23-17 at 20.

Based on the record before it and drawing all reasonable inferences in Strasser's favor, the Court cannot find, as a matter of law, that she "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  While "the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has . . . exercised reasonable care in preventing and correcting sexually harassing conduct," Caridad, 191 F.3d at 295, "[t]he mere existence of sexual harassment complaint procedures does not immunize [a] defendant." Crisonino v. N.Y. City Hous. Auth., 985 F. Supp. 385, 390 (S.D.N.Y. 1997); see also Kracunas v. Iona Coll., 119 F.3d 80, 89 (2d Cir. 1997). Although it did have an anti-harassment/anti-discrimination policy in place, there remains a factual dispute as to whether Irving Tissue took reasonable steps to enforce it.  Defendant also claims that its employees followed up with Strasser to ensure that she no longer had complaints, but Strasser

denies that these conversations took place.  Defendant also points to the fact that Plaintiff never referenced the PA pages when she made separate complaints about another employee to Ms. Cerillo on two other occasions, but Plaintiff testified that she "assume[d]" Daggett was reporting the conduct to Ms. Cerillo.  Compare DML at 18-19 with Pl.'s Dep. Tr. 130:18-20.  The Court determines that a jury is better suited both to weigh the conflicting statements concerning Irving Tissue's response to Strasser's complaints and to assess whether Strasser acted reasonably in reporting the alleged harassment primarily to Mr. Daggett as her direct supervisor.  For the above reasons, the Court denies summary judgment with respect to Plaintiff's hostile work environment claim.

### B. Retaliation Claim

Defendant further argues that summary judgment on Plaintiff's retaliation claim is warranted for two reasons: first, because Plaintiff cannot establish that she was constructively discharged; and second, because she cannot show any deliberate acts on the part of Irving Tissue to sustain a retaliation claim.  DML at 22-25.  The basis for Plaintiff's retaliation claim is somewhat unclear and seems to vacillate between a more general claim of constructive discharge and a more specific claim based on Defendant's transfer of Ms. Strasser's husband to a different shift schedule.  Regardless, the Court finds that summary judgment is warranted on this claim for the reasons below.

1. Constructive Discharge

The threshold of proof necessary to establish a claim of constructive discharge is higher than that required for a hostile work environment claim.  In order to show a constructive discharge, Plaintiff must demonstrate "working conditions so intolerable that a reasonable person would have felt compelled to resign."  Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004).

-26-

Additionally, in assessing Plaintiff's constructive discharge claim, the Court must determine whether Defendant deliberately made her working conditions so intolerable that she was forced to resign.  Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983); Hockeson v. New York State Office of Gen. Servs, 188 F. Supp. 2d 215, 220 (N.D.N.Y. 1998) (Kahn, J.).

The Court finds that even if Plaintiff could establish that her working conditions were so intolerable that they would have compelled a reasonable person to resign, Plaintiff cannot establish that Irving Tissue deliberately made them so.  At most, as discussed above, a reasonable factfinder might conclude that Irving Tissue failed to take reasonable steps to prevent or correct the harassment she allegedly experienced in the Mill.  However, a failure on the part of Defendant's management to adequately respond to Strasser's complaints does not give rise to a finding that the company deliberately made her working conditions so intolerable that she was forced to resign.  See Hockeson, 188 F. Supp. 2d at 220 (finding no deliberateness on part of employer where coworkers told plaintiff that she had to "sink or swim" and "one more step and she was out the door").  For this reason, the Court grants summary judgment in favor of Defendant with respect to Plaintiff's constructive discharge claim.

2.  Michael Strasser's Shift Change

In determining whether summary judgment is warranted on the specific issue of whether Michael Strasser's shift change operated as a retaliation against Plaintiff, the Court must apply the "burden-shifting framework" articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under this framework, Plaintiff must first establish: (1) that she participated in a protected activity known to the Defendant; (2) that an adverse employment action occurred; and (3) a causal connection between the protected activity and the adverse action.  Quinn,

159 F.3d at 769.  Once Plaintiff has satisfied these three requirements of proof with a "minimal amount of evidence," Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010), the Defendant must articulate a legitimate, nondiscriminatory rationale for its actions, and Plaintiff must respond by showing that this rationale is merely pretextual.  Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 129 (2d Cir. 1996).  The Court finds that Defendant has satisfied its burden under this framework, and Plaintiff has failed to meet hers.  Accordingly, summary judgment is warranted in Defendant's favor on this issue.

With respect to the first step in the McDonnell Douglas framework, the Court notes that Defendant changed Michael Strasser's shift before Plaintiff filed her EEOC Complaint, and thus the only "protected activity" for which Defendant could plausibly have retaliated against Plaintiff for engaging in was the complaints she claimed to have made to her supervisor and Ms. Cerillo in Human Resources.  In order to show that these complaints constituted a protected activity, "the plaintiff need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute."  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998) (internal quotations omitted).  Additionally, Plaintiff must show that from her complaints, Defendant "understood, or could reasonably have understood, that [her] opposition was directed at conduct prohibited by Title VII."  Id.

In assessing whether internal complaints about sexual harassment constitute a protected activity under Title VII, "[t]he focus of the Court's inquiry is on substance rather than form."  Miller v. Edward Jones & Co., 355 F. Supp. 2d 629, 642 (D. Conn. 2005).  Although there is no written record to show the substance of these complaints, the Court finds that Plaintiff has produced a

"minimal amount of evidence" indicating that they qualified as protected activity under Title VII.

Kaytor, 609 F.3d at 552.  Plaintiff has testified that she complained to her supervisor about the

pages at issue, including one exclaiming "Help me, I need a man!"  Pl. Dep. Tr. 54-55, 79-80.  She

also claims that she stated to her supervisor "that the pages were harassing and discriminatory."

PRSMF ¶ 90.  Furthermore, Defendant has claimed, and Plaintiff has testified, that on at least one or

more occasions copies of the company's anti-harassment/anti-discrimination policy were distributed

to employees after she complained about her treatment.  See DSMF ¶ 130; Pl.'s Dep. Tr. 80:16 -

81:17.  This would suggest that Plaintiff included in the substance of at least one or more of her

complaints some indication that the conduct of which she was complaining "put Defendant on

notice of potential discrimination."  Kamrowski v. Morrison Mgmt. Specialist, No. 05-CV-9234,

2010 WL 3932354, at *22 (S.D.N.Y. Sept. 29, 2010) (citing Galdieri, 236 F.3d at 292).  Without

adjudicating the lawfulness of the complained-of conduct, the Court finds that Plaintiff has satisfied

the first prong of the McDonnell Douglas framework.

However, Plaintiff stumbles and ultimately fails on the second and third steps of this test.

She has not established that her husband's shift change was an adverse employment action.  A shift

change is not per se an adverse employment action.  DiBrino v. Dep't of Veterans' Affairs, 118 Fed.

Appx. 533, 535 (2d Cir. 2004).  Rather, Plaintiff must show that it created a "materially adverse

change" in the terms and conditions of her employment.  Sanders v. New York City Human

Resources Admin., 361 F.3d 749, 755 (2d Cir. 2004).  Even in Title VII retaliation cases in which

the plaintiff herself and not her partner experienced a shift change, courts in this Circuit have found

that this did not constitute an adverse employment action where the plaintiff had "offer[ed] no

evidence of differences between the two shifts in pay, benefits, responsibilities, opportunity for

advancement or other terms, conditions and privileges of employment." Bright v. LeMoyne

College, 306 F. Supp. 2d 244, 254 (N.D.N.Y. 2004); see also DiBrino, 118 Fed. Appx. at 535

(finding no adverse employment action where plaintiff failed to "provide any evidence of

extraordinary circumstances to show that the shift change in her case was materially adverse."). The

Court considers that Plaintiff's inability to work on the same shift as her husband may have been

personally inconvenient, but it does not represent a materially adverse change in the conditions or

terms of her employment. Moreover, Defendant's subsequent offer to Plaintiff of the opportunity to

work on the same shift as her husband indicates that the company did not intend the inconvenience

to be a permanent one. See Bright, 306 F. Supp. 2d at 254 (noting that "[t]here is no evidence that

[plaintiff's shift change] was a permanent change"); Villagomez v. Catholic Charities, No. 3:09 CV

1001, 2010 WL 4929264, at *9 (D. Conn. Nov. 30, 2010) (finding no adverse employment action

where plaintiff's shift was temporarily changed and she was permitted to change it after she voiced

concern about the change). For these reasons, the Court finds that Plaintiff has failed to meet her

burden of establishing an adverse employment action under Title VII.

As a final matter, even if Plaintiff could establish that the shift change constituted an adverse

employment action, her claim would still fail on the third requirement of the McDonnell Douglass

test, namely, that she establish a causal connection between the shift change and her internal

complaints about the alleged harassment. The strongest argument that Plaintiff's counsel can

muster in favor of a causal connection is the "[c]lose temporal proximity" between the protected

action and the adverse employment action, i.e., the "sudden" nature of Michael Strasser's shift

change. POM at 21 (citing Kaytor, 609 F.3d at 552). Given that Strasser was complaining about

the alleged harassment from 2006 onward, and Michael Strasser was not informed about his shift

change until the fall of 2007, such a temporal connection is highly tenuous.  See Shah v. New York

State Dep't of Civil Serv., 341 Fed. Appx. 670, 673 (2d Cir. 2009) (finding no inference of a causal

connection where "[t]he earliest of the purported adverse actions . . . came over one year after

[plaintiff] filed his discrimination claim.").

Moreover, Defendant has articulated a legitimate rationale for changing Michael Strasser's

shift in that the company was shutting down the CW machine because it was no longer profitable.

Not only does Plaintiff offer no evidence to rebut this as pretextual beyond the conclusory statement

that it was such, see POM at 22, it seems highly implausible that Defendant would shut down an

otherwise profitable machine merely to retaliate against Plaintiff.  And while Plaintiff attempts to

cast a sinister shadow over Defendant's subsequent offer to her of an opportunity to work on the

same shift as her husband, see id., the Court fails to perceive it as evidence of anything beyond an

attempt on the part of Defendant to fill a job opening on one of its crews – and, far from evidence of

retaliation, as evidence of Defendant's willingness to accommodate the Strassers' desire to work on

the same shift.

Furthermore, when pressed in her deposition as to why she thought Defendant retaliated

against her, Plaintiff responded that "they didn't stop the harassment or anything."  Pl.'s Dep. Tr. at

164:11.  While this is relevant to the issue of whether liability may be imputed to Irving Tissue in

the context of Plaintiff's hostile work environment claim, it is not a sufficient basis for a retaliation

claim, and nowhere does Plaintiff indicate that she thought Irving Tissue retaliated against her by

changing her husband's shift.  In fact, when asked what her understanding was as to why her

husband had to change shifts, Plaintiff testified, "I think he was on the CWs and they shut them

down."  Id. at 35-13-14; see also Bruno v. Sonanalysts, Inc., No. 3:01CV1501, 2004 WL 2713239,

at *6 (D. Conn. Nov. 23, 2004) (finding no retaliation where plaintiff testified at her deposition that employer did not punish her for her harassment complaints). Additionally, Mr. Strasser testified that he believed his shift change occurred because "they had a certain number of line leaders per crew and they needed to rebalance the line leaders" after the CW machines were shut down. M. Strasser Dep. Tr. 29:6-8; see also DMSF ¶ 155; Villagomez, 2010 WL 4929264, at *9 (finding no retaliation where plaintiff acknowledged that a temporary change in her shift "was made for legitimate business reasons rather than to retaliate against or punish her"). Nothing in the record suggests that Defendant's decision to change Mr. Strasser's shift was motivated by anything but legitimate business reasons. Accordingly, the Court grants summary judgment with respect to Plaintiff's retaliation claim.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion for summary judgment (Dkt. No. 23) is **GRANTED** in part and **DENIED** in part, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that summary judgment be **GRANTED** with respect to Plaintiff's retaliation claims; however, summary judgment is **DENIED** with respect to Defendant's other arguments raised in its Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:      May 17, 2011
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

-32-